1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7              WESTERN DISTRICT OF WASHINGTON
                          AT TACOMA
8   ANTOINE D. JOHNSON, M.D.,
9                 Plaintiff,              CASE NO. C06-5502BHS
10        v.                              ORDER (1) GRANTING
                                          DEFENDANT SHIN'S SECOND
11  GRAYS HARBOR COMMUNITY                MOTION FOR SUMMARY
    HOSPITAL; GRAYS HARBOR                JUDGMENT, (2) GRANTING
12  COMMUNITY HOSPITAL MEDICAL            DEFENDANTS TIMOTHY
    STAFF; GRAYS HARBOR                   TROEH, MD; GREGORY MAY,
13  COMMUNITY HOSPITAL                    MD; DANIEL CANFIELD, DO;
    GOVERNING BOARD; KI SHIN, MD;         SHELLY J. DUEBER, MD; AND
14  TIM TROEH, MD; BRENT ROWE,            ROBIN FRANCISCOVICH, MD'S
    MD; GREGORY MAY, MD; DANIEL           MOTION FOR SUMMARY
15  CANFIELD, MD; ROBIN                   JUDGMENT, AND (3) GRANTING
    FRANCISCOVICH, MD; THOMAS J.          DEFENDANTS GRAYS HARBOR
16  HIGHTOWER, MD; SHELLY                 COMMUNITY HOSPITAL,
    DUEBER, MD; and DOES 1 through 50     BRENT ROWE, MD, AND
17  inclusive,                            THOMAS HIGHTOWER'S
                                          MOTION FOR SUMMARY
18                Defendants.             JUDGMENT

19
20        This matter comes before the Court on Defendant Shin's Second Motion for

21  Summary Judgment (Dkt. 207), Defendants Timothy Troeh, MD; Gregory May, MD;

22  Daniel Canfield, DO; Shelly J. Dueber, MD; and Robin Franciscovich, MD's ("the

23  Doctor Defendants") Motion for Summary Judgment (Dkt. 224), and Defendants Grays

24  Harbor Community Hospital, Brent Rowe, MD, and Thomas Hightower's ("the Hospital

25  Defendants") Motion for Summary Judgment (Dkt. 248). The Court has considered the

26  pleadings filed in support of and in opposition to the motions and the remainder of the file

27  herein.

28
    ORDER - 1

# I. FACTUAL BACKGROUND

The following are the facts taken in the light most favorable to Dr. Johnson, the nonmoving party:

On December 28, 2001, Plaintiff was informed that he was granted a one-year provisional staff appointment to Grays Harbor Community Hospital ("Grays Harbor"). Dkt. 1 at 5; Dkt. 1-2, Exh. B at 4. The parties dispute whether Dr. Johnson was granted a regular medical staff appointment after his provisional appointment. Dr. Johnson contends that after completion of the one-year provisional appointment, he did not apply for initial appointment to the medical staff of Grays Harbor. Dkt. 1 at 5; Dkt. 1-2, Exh. B at 4; *but see* Dkt. 225-2, Exh. 6 at 19 (Request and Authorization for Release of Information signed October 18, 2002). In November of 2002, the Medical Executive Committee changed Dr. Johnson's status from provisional to active. Dkt. 116 at 2; Dkt. 116-2, Exh. A; Dkt. 116-4, Exh. C at 3.

In December of 2002, Grays Harbor responded to a credentialing questionnaire from Molina Healthcare of Washington ("Molina"). Dkt. 1 at 4; Dkt. 1-2, Exh. A at 2. Sue Vance, who is not a party to this case, told Molina that Dr. Johnson's clinical privileges at Grays Harbor were renewed on November 12, 2002, and that Dr. Johnson had full admitting privileges and medical staff membership. Dkt. 1 at 5; Dkt. 1-2, Exh. A at 2.

On July 30, 2003, Dr. Johnson admitted a patient to Grays Harbor who was suffering from a possible "infectious process" and allergic reaction. Dkt. 225-2, Exh. 8 at 23. The patient's condition deteriorated, and the patient went into cardiac arrest on August 4, 2003. *Id.* The patient was ultimately transferred to Harborview Medical Center, where she expired. *Id.*

Dr. Shin contacted Dr. Johnson by letter to ask about this patient. Specifically, Dr. Shin sought information about a lack of documentation of any evaluation of the patient by

Dr. Johnson in the days preceding the transfer and about a discharge instruction sheet that predated the patient's transfer. *Id.*

By letter, Dr. Johnson responded that documentation was lacking because he was out of town in the days preceding the patient's transfer. Dkt. 225-2, Exh. 9 at 26. Dr. Johnson expected Dr. Canfield to provide coverage while Dr. Johnson was out of town. *Id.* While Dr. Johnson was out of town, he still received calls regarding this patient. *Id.*

The Quality and Utilization Review ("QUR") Committee met to discuss this incident and noted that there was no documentation in the patient's chart indicating that Dr. Johnson had transferred care to another physician while he was out of town. Dkt. 225-3, Exh. 10 at 2. The QUR Committee decided to observe Dr. Johnson's documentation for a six-month period and warned Dr. Johnson that "[a]ny lapse of daily progress notes or adequate documentation of transfer of care to another physician may potentially result in further disciplinary actions." *Id.* The QUR Committee also noted the lack of a clear policy governing the transfer of care between physicians:

> There does not appear to be a clear policy for signing patient care to another physician. . . . There needs to be a clear, written policy for steps to be taken when [an] attending physician will not be available to see his/her patients and needs to sign patient care to another physician.

Dkt. 234, Exh. P120 at 11.

Meanwhile, on November 26, 2003, Dr. Johnson's privileges were temporarily suspended for failure to complete delinquent patient charts. Dkt. 225-3, Exh. 11 at 4.

In June of 2004, eight doctors (one of whom is a defendant in this action) of Family Medicine of Grays Harbor provided notice that they would no longer provide coverage for Dr. Johnson. Dkt. 225-3, Exh. 14 at 14. Dr. Johnson thereafter provided notice that effective July 1, 2004, he would not be taking call for any other physicians and would hire a physician to provide coverage for him while he was out of town. Dkt. 225-3, Exh. 15 at 16.

In June of 2004, Grays Harbor began preparations for a routine survey by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"). Dkt. 113 at 3. As part of such preparations, medical staff personnel realized that some physicians' files had not been updated. Dkt. 113 at 3. The files of two members, including Dr. Johnson, were missing current letters of reappointment. Dkt. 113 at 3. The other member's[1] reappointment could not be confirmed, and the member's admitting privileges were interrupted for approximately one month while the member reapplied. Dkt. 113 at 3.

Dr. Johnson's reappointment was ultimately confirmed through a review of minutes from 2002 Board of Directors meetings. Dkt. 113 at 3. Specifically, the minutes contained a November 2002 entry approving Dr. Johnson's full appointment to the medical staff. As a result, Dr. Johnson was permitted to continue admitting patients to Grays Harbor. Dkt. 113 at 3.

On July 16, 2004, Dr. Johnson admitted a patient who remained in the hospital until July 19, 2004. There was no history or physical for the patient and no progress notes for July 17 or 18. Dkt. 255-3, Exh. 19 at 25.

On August 25, 2004, Dr. Johnson admitted a patient for detox. There was no history and physical for the patient, no progress notes until August 27, and no additional progress notes until August 30. Dkt. 225-3, Exh. 16 at 18. Nurses reported that the patient had not been seen by any physician for three days and was receiving unusually high doses of Valium pursuant to a prescription made by Dr. Johnson over the telephone. Dkt. 113 at 4. As Chief of Staff, Dr. Shin investigated the nurses' report and contacted Dr. Johnson. *Id.* Dr. Shin found Dr. Johnson's justifications to be insufficient and summarily suspended Dr. Johnson pending formal investigation by the Credentials Committee. *Id.* On September 3, 2004, Thomas Hightower informed Dr. Johnson by letter that his clinical privileges were summarily suspended based on a review of documentation for one of Dr. Johnson's patients. Dkt. 1-2, Exh. D at 8.

---

[1] The parties have stipulated to refraining from identifying this physician by name.

In a letter dated September 27, 2004, the Grays Harbor medical staff coordinator informed Dr. Johnson that his two-year term of privileges would expire on November 28, 2004 and that he was required to submit a reappointment packet. Dkt. 1-3, Exh. J at 10.

In October of 2004, the Credentials Committee investigated the suspension and found that it was warranted. Dkt. 113 at 5. The Credentials Committee also approved a remedial plan under which Dr. Johnson's privileges would be restored if he satisfied certain requirements, including evaluation by the Washington Physician Health Program, six months of monitored patient admissions, and timely documentation of hospitalized patients. Dkt. 11 at 5; Dkt. 225-4, Exh. 22 at 26.

After Grays Harbor received the evaluation from the Washington Physicians Health Program, Grays Harbor agreed to reinstate Dr. Johnson's privileges, effective upon completion of outstanding medical records and subject to certain conditions (monitoring of Dr. Johnson's patients for six months, completion of a history and physical for each patient chart within 24 hours of admission, and a progress note in each patient chart within the hours of 6:00 a.m. and noon). Dkt. 1-3, Exh. I at 5; Dkt. 225-4, Exh. 23 at 28.

Dr. Johnson responded to the suspension by stating his belief, in writing, that his actions were being singled out and punished and that identical actions of other physicians were tolerated. Dkt. 255-3, Exh. 17 at 20. Dr. Johnson contended that he had "unique circumstances" and that as the only African American in the Grays Harbor medical community, he lacked the "support network" available to other physicians and "had difficulty obtaining other doctors to participate with [him] in a call group." *Id.*

Dr. Shin and Mr. Hightower responded in a letter, asserting that they did not believe that the Bylaws were being applied unevenly and that the incident was the third incident in a pattern of infractions. Dkt. 255-3, Exh. 18 at 22.

On November 26, 2004, Grays Harbor again informed Plaintiff that his privileges would expire if he did not submit a reapplication packet. Dkt. 1-3, Exh. J at 8.

In January of 2005, Plaintiff was sent an initial application for privileges. Dkt. 1-3, Exh. L at 14.

In June of 2005, Molina again requested information regarding Dr. Johnson. Catherine Wright responded to the request, informing Molina that Dr. Johnson was granted privileges in November 2001 and that those privileges expired in November of 2004. Dkt. 1-2, Exh. E at 10. Ms. Wright also indicated that Dr. Johnson's privileges were suspended on November 26, 2003, and September 3, 2004, for "failure to complete delinquent patient charts in a timely manner." Dkt. 1-2, Exh. E at 11.

Molina also sent Dr. Troeh a reference letter regarding Dr. Johnson. Dkt. 1-3, Exh. H at 2. In response, Dr. Troeh called Molina and spoke with Kari Muse, credentialing director for Molina. *See* Dkt. 225-6, Exh. 36 at 21. Ms. Muse made notes of her conversation. Dkt. 234, Exh. P127 at 58. Dr. Troeh told Ms. Muse that he did not want to complete a questionnaire regarding Dr. Johnson and instead preferred to talk with Ms. Muse confidentially. *Id.* at 58-59. Dr. Troeh told Ms. Muse that one of Dr. Johnson's patients died. *Id.* at 61; *see also* Dkt. 234, Exh. P 123 at 31-32.

Dr. Johnson requested another application for privileges on August 1, 2005. Dkt. 225-4, Exh. 25 at 32. In November of 2005, Dr. Robin Franciscovich sent Dr. Johnson a letter advising him that he was required to update his patients' medical records before his application would be considered and identifying five incomplete records. Dkt. 225, Exh. 26 at 2. Dr. Franciscovich also advised Dr. Johnson that his privileges could have been reinstated in November of 2004 if he had completed the records at that time. *Id.*

In December of 2005, Dr. Johnson submitted a new application form, which indicated that Dr. Johnson's previous affiliation with Grays Harbor ended in September of 2004 because he started a new practice. Dkt. 225-5, Exh. 27 at 9. On March 14, 2006, Dr. May, as the Chairman of the Credentials Committee, wrote Dr. Johnson to inform him that he would not be granted hospital privileges and that the "initial phase of credentialing" revealed an unfavorable recommendation from the Primary Care

Department Chairperson and an outstanding claim against Dr. Johnson's medical license. Dkt. 234, Exh. P 126 at 50. On March 26, 2006, the Board of Directors denied Dr. Johnson's request for privileges. Dkt. 225-5, Exh. 34 at 49.

## II. PROCEDURAL BACKGROUND

On August 31, 2006, Plaintiff Antoine Johnson filed suit in federal court seeking declaratory, injunctive and equitable relief, compensatory and punitive damages, and attorneys' fees and costs for (1) racial discrimination under 42 U.S.C. § 1981; (2) deprivation of rights under 42 U.S.C. § 1983; (3) defamation of character under 42 U.S.C. § 1983, RCW 9.58.010, and RCW 49.44.010; (4) impairing the obligation of a contract pursuant to Article 1, Section 10 of the United States Constitution and Article 1, Section 23 of the Washington State Constitution; (5) retaliation under 42 U.S.C. §1983 and the Fourteenth Amendment to the United States Constitution; (6) tortious interference with present and future contractual relationships under 42 U.S.C. §§ 1991, 1983, the Fourteenth Amendment to the United States Constitution, and RCW 49.44.010; (7) fraud and forgery in violation of RCW 9A.060.010, 020 and 42 U.S.C. § 1983; and (8) negligence pursuant to RCW 5.40.050, RCW 70.41.23, RCW 70.43.010, and Article 1, Section 10 of the United States Constitution. Dkt. 1 at 10-13.

On October 17, 2007, the Court granted in part and denied in part Dr. Shin's first motion for summary judgment. Dkt. 146. Specifically, the Court granted the motion as to Plaintiff's third, fourth, fifth, sixth, seventh, and eighth causes of action and as to blacklisting. Dkt. 146 at 20. The Court denied the motion without prejudice as to Plaintiff's second and ninth causes of action. *Id.*

Dr. Shin now moves for summary judgment on Plaintiff's remaining claims. On January 31, 2008, the Court granted Dr. Johnson a continuance to provide the parties an opportunity to file a supplemental response and reply "incorporat[ing] items recently received in discovery." Dkt. 230. Pursuant to that order, Dr. Shin filed a supplemental reply to join the legal arguments raised in a pending motion for summary judgment

brought by Dr. Shin's co-defendants. Dkt. 231. Such arguments are outside the scope of the Court's order and are not properly before the Court for purposes of deciding Dr. Shin's summary judgment motion. The Court has therefore declined to consider these arguments when deciding Dr. Shin's summary judgment motion.

Also pending before the Court are the Doctor Defendants' Motion for Summary Judgment (Dkt. 224) and the Hospital Defendants' Motion for Summary Judgment (Dkt. 248). In the interests of judicial economy, the Court has considered the pending motions concurrently.

### III. DISCUSSION

#### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must

meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual

issues of controversy in favor of the nonmoving party only when the facts specifically

attested by that party contradict facts specifically attested by the moving party. The

nonmoving party may not merely state that it will discredit the moving party's evidence at

trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec.*

*Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, nonspecific

statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan*

*v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

As a threshold matter, the Court notes that the form of Dr. Johnson's opposition

papers has frustrated the Court's efforts to evaluate the merits of Dr. Johnson's

contentions. For example, Dr. Johnson's response to the Doctor Defendants' motion

consists almost entirely of factual allegations that fail to differentiate among Plaintiff's

claims and among Defendants. Dr. Johnson devotes approximately 15 pages to his 42

U.S.C. § 1981 claim, one paragraph to his 42 U.S.C. § 1983 claim, and then "incorporates

all arguments he has made" in support of his remaining claims. *See* Dkt. 233 at 31. To

withstand summary judgment requires more than mere confusion of the legal claims and

their factual bases. Therefore, while the Court has endeavored to assess the merits of Dr.

Johnson's claims, the Court may not create and define Dr. Johnson's claims for him. With

this in mind, the Court turns to the merits of the pending motions.

**B.     FAILURE TO ARBITRATE**

The Doctor Defendants contend that all disputes "arising out of medical staff

membership or clinical privileges between an applicant or member of the medical staff

and the hospital, medical staff or any person acting as its agent" are subject to arbitration.

Dkt. 224 at 30; Dkt. 225-4, Exh. 21 at 16. Dr. Johnson contends that the Doctor

Defendants are not entitled to rely on this provision because they failed to exhaust all

procedures contained in the Bylaws and therefore waived their rights to compel

arbitration. Dr. Johnson also contends that the Doctor Defendants waited too long before asserting the right to resolve this dispute by arbitration. The Court agrees.

This matter has been pending since August of 2006. The parties have conducted discovery and engaged in substantial motions practice before this Court. The Doctor Defendants sought to invoke the arbitration clause only in their summary judgment motion, filed more than one year after the complaint was filed. *See Ives v. Ramsden*, 174 P.3d 1231, 1238-39 (2008) (Defendant waived his right to arbitration where parties "engaged in extensive discovery, deposed witnesses, submitted and answered interrogatories, and prepared fully for trial" over the course of three years and defendant did not propose that court proceedings be stayed until eve of trial.) The Court therefore declines to dismiss Plaintiff's claims for failure to arbitrate.

## C.   MOTIONS TO STRIKE

The Doctor Defendants move to strike portions of Dr. Johnson's declaration, Exhibit P135, and the declaration of Lawanda Johnson. Dkt. 243 at 15. The Hospital Defendants move to strike a similar declaration filed by Dr. Johnson in connection with their motion. Dkt. 259 at 10. In a surreply brief, Dr. Johnson moves to strike the Doctor Defendants' reply brief as over-length, contests various arguments made in the reply, responds to the Doctor Defendants' motion to strike, and contends that the motion to strike is not properly before the Court.[2] Dkt. 247. In a different surreply brief, Plaintiff moves to strike Dr. Shin's reply. Dkt. 223. Finally, Dr. Johnson moves to strike the Hospital Defendants' reply. Dkt. 263.

The Doctor Defendants identify several paragraphs of Dr. Johnson's declaration and contend that the paragraphs are not based on personal knowledge, constitute hearsay, are conclusory, and offer improper legal opinions and argument. Dkt. 243 at 17. The

---

[2] Dr. Johnson's contention that the motion to strike should be filed and noted separately is without merit. *See* Local Rule CR 7(g) ("Requests to strike material contained in or attached to submissions of opposing parties shall not be presented in a separate motion to strike, but shall instead be included in the responsive brief, and will be considered with the underlying motion.").

Doctor Defendants take issue with Dr. Johnson's assertions as to what the exhibits accompanying his declaration "reveal." Dkt. 43 at 17. These statements appear to be an attempt to identify the purported relevance of the exhibits and are not wholly improper. To the extent that Dr. Johnson's summary of what the exhibits "reveal" is in conflict with the exhibits themselves, the Court notes that statements lacking evidentiary support cannot create a genuine issue of material fact but need not be stricken from the record. To the extent that Dr. Johnson's declaration is an extension of his response and contains legal argument, the Court has considered the declaration in the interest of evaluating Dr. Johnson's claims on the merits. The motion to strike is therefore denied.

Exhibit P135 consists of letters, newspaper articles, and other materials that Dr. Johnson relies upon to establish that Grays Harbor Community Hospital is a state actor. These documents do not satisfy Dr. Johnson's burden to create a genuine issue of material fact and are unauthenticated. *See Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 883 (9th Cir. 1982) ("A party may not prevail in opposing a motion for summary judgment by simply overwhelming the district court with a miscellany of unorganized documentation."). The motion to strike this exhibit is therefore granted.

Lawanda Johnson's declaration recounts a phone conversation between Ms. Johnson and Mr. Ross regarding Mr. Ross' review of Grays Harbor Community Hospital's credentialing files. Dkt. 235. Ms. Johnson's summary of statements made by Mr. Ross constitute hearsay. Mr. Ross was apparently hired as a consultant to assist Grays Harbor Community Hospital with the JCAHO survey. As a consultant, it does not appear that Mr. Ross was authorized to make statements on behalf of the hospital. Ms. Johnson's declaration is therefore stricken.

Dr. Johnson moves to strike the Doctor Defendants' 19-page reply brief as over-length. Dkt. 247. The Doctor Defendants were permitted to file a 33-page summary judgment motion. Dkt. 227. Accordingly, the reply brief was limited to 16 pages. *See*

Local Rule CR 7(f)(4). Because the Court construes much of Dr. Johnson's declaration to constitute legal argument, the Court declines to strike the reply as over-length.

Dr. Johnson also moves to strike Dr. Shin's reply brief. Dkt. 223. Dr. Johnson seeks to strike paragraphs from Dr. Shin's reply because he disagrees with assertions therein. Mere disagreement with legal argument is not a proper basis for moving to strike. The Court therefore declines to strike Dr. Shin's reply brief.

Finally, Dr. Johnson moves to strike the Hospital Defendants' reply brief. Dkt. 263. Dr. Johnson offers additional argument and authority to contest assertions made in the reply brief. Again, mere disagreement with legal argument is not a proper basis for moving to strike. The Court therefore declines to strike the Hospital Defendants' reply brief.

**D.   IMMUNITY**

Dr. Shin contends that he is entitled to statutory immunity for his 2003 service on the Quality and Utilization Review ("QUR") Committee, his 2004 service as Chief of Staff for Grays Harbor, and his contacts with the Chief Executive Officer and Credentials Committee. Dkt. 207 at 4. The Doctor Defendants contend that they are entitled to immunity pursuant to the Bylaws. Dkt. 224 at 30. Dr. Rowe and Mr. Hightower contend that they are entitled to immunity for actions taken while serving as directors or officers of Grays Harbor.

Under RCW 4.24.240(2), members of a professional review committee are not liable in civil actions for acts or omissions made in good faith on behalf of the committee.

Under RCW 4.24.250(1), health care providers who in good faith provide evidence of incompetency or gross misconduct to a regularly constituted review committee or regularly constituted board or committee charged with review and evaluation of the quality of patient care are immune from civil actions for such activities. To determine whether the records of such boards and committees are subject to disclosure in discovery under this section, Washington courts may consider the guidelines and standards of the

Joint Commission on Accreditation of Hospitals, the Bylaws and internal regulations of the hospital, the organization and function of the committee, whether the committee is "regularly constituted," and whether the committee's function is aimed at current patient care or retrospective review. *Coburn v. Seda*, 101 Wn.2d 270, 278 (1984).

Under RCW 70.41.200(2), any person who, in substantial good faith, provides information to further the purposes of a quality improvement and medical malpractice prevention program or participates on the quality improvement committee shall not be subject to an action for civil damages as a result of such activity.

**1.      Dr. Shin's Service on the QUR Committee and Credentials Committee**

Dr. Shin asserts several statutory bases for immunity for his service on the QUR Committee. The Bylaws describe the functions of the QUR Committee as follows:

> The committee shall be responsible for Medical Staff functions relating to Quality Review, Cost Containment, Medical Records, Utilization Review (including tissue and transfusion review), and discharge planning, and shall be responsible for coordination of medical care evaluation studies with the various clinical departments.

Dkt. 134-3, Exh. P68 at 24. The QUR Committee's quality review responsibilities are as follows:

> The committee shall be responsible for providing an ongoing Quality Review Program designed to objectively and systematically monitor and evaluate the quality and appropriateness of patient care, determine that one level of patient care is provided, and that patients with the same health problem receive the same standard of care, and pursue opportunities to improve patient care and resolve identified problems. It will establish an ongoing Hospital wide Quality Review Plan to be approved by the Medical Staff and the Board of Directors.

*Id.* The Bylaws provide for monthly meetings of the QUR Committee. *Id.* at 26.

The function of the Credentials Committee was to review applicant credentials, investigate applicants, make recommendations regarding applicants, report to the Medical Executive Committee regarding each applicant for medical staff appointment and clinical privileges, review information regarding professional and clinical competence of medical staff members and recommend the granting, reduction, or withdrawal of promotions,

privileges and reappointment, and review reports concerning referred medical staff appointees. *Id*. at 28. The Bylaws specify that the Credentials Committee meets as often as necessary and not fewer than six times each year. *Id*.

The Court finds that the QUR Committee and Credentials Committee were "regularly constituted" and that their functions were to review patient care and medical staff performance. The Court therefore concludes that Dr. Shin is entitled to immunity for actions taken in good faith on behalf of the QUR Committee while a member and for providing information to the QUR Committee or Credentials Committee in good faith. *See* RCW 4.24.240(2); RCW 4.24.250(1); RCW 70.41.200(2).

### 2.    Dr. Shin's Service as Chief of Staff, Dr. Rowe, and Mr. Hightower

Dr. Shin contends that all of his actions as Chief of Staff were discretionary decisions for which he is not individually liable because they do not rise to the level of gross negligence. Dkt. 207 at 7. Similarly, Dr. Rowe and Mr. Hightower contend that they are entitled to immunity for actions taken as a director or officer of Grays Harbor. Dkt. 248 at 23.

Members of the boards of directors and officers of any nonprofit corporation are not individually liable for discretionary decisions within their official capacities unless the decisions constitute gross negligence. RCW 4.24.264(1). The Grays Harbor Chief of Staff is a member of the Board of Directors. Dkt. 134-3, Exh. P68 at 14. Grays Harbor is a nonprofit corporation. Dkt. 208, Exh. B at 14. Therefore, Dr. Johnson may only impose individual liability on Dr. Shin, Dr. Rowe, and Mr. Hightower for decisions made outside of their official capacities as officers or directors or for decisions that amount to gross negligence.

### 3.    The Doctor Defendants

The Bylaws confer immunity as an "express condition" applicable to persons having or seeking privileges:

1

2

    (a) To the fullest extent permitted by law, the applicant or appointee extends absolute immunity to, and releases from liability, this Hospital and its representatives and any third party with respect to any and all civil liability which might arise from any acts, communications, reports, recommendations, or disclosures involving an applicant or appointee, performed, made, requested or received by this Hospital and its representatives to, from, or by any third party including other appointees to the Medical Staff concerning activities relating, but not limited, to:

3

4

    (1) Applications for appointment or clinical privileges, including temporary privileges;

5

6

    (2) Periodic reappraisals undertaken for reappointment or for increase or decrease in clinical privileges;

7

8

    (3) Proceedings for reduction or suspension of clinical privileges or revocation of Medical Staff appointment, or any other disciplinary sanction;

9

10

    (4)     Summary suspension;

11

* * *

12

13

    (d) The applicant or appointee specifically releases from any liability all representatives of the Hospital, including all appointees to its Medical Staff, for investigations requested, statements made, materials provided or acts performed in good faith evaluating the applicant or appointee for any of the purposes or reasons set forth in this section.

14

15

Dkt. 225-4, Exh. 21  at 14-15. Pursuant to these provisions, the Doctor Defendants are

16

entitled to summary judgment unless Dr. Johnson can create a genuine issue of material

17

fact as to whether the conduct alleged was undertaken in good faith or falls outside of

18

these provisions.

19

**E.     42 U.S.C. § 1981**

20

    Dr. Johnson's second cause of action is race discrimination in violation of 42

21

U.S.C. § 1981, which provides that "[a]ll persons . . . shall have the same right . . . to

22

make and enforce contracts, to sue, be parties, give evidence, and to the full and equal

23

benefit of all laws and proceedings for the security of persons and property as is enjoyed

24

by white citizens . . . ." 42 U.S.C. § 1981(a). In analyzing claims under 42 U.S.C. § 1981,

25

courts use the framework of Title VII, including the *McDonnell-Douglas* burden-shifting

26

analysis. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 n.5 (9th Cir.

27

2006).

28

In the Ninth Circuit, there are two methods of establishing a prima facie case of disparate treatment under Title VII. First, Plaintiff may establish his case by submitting direct evidence of discriminatory intent. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). Second, Plaintiff may establish a prima facie case by showing that he is entitled to a presumption of discrimination arising from factors such as those set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Here, it appears that Dr. Johnson primarily seeks to invoke a presumption of discrimination:

> By denying PLAINTIFF staff membership, and clinical privileges, a contractual relationship, Defendants have violated 42 U.S.C. § 1981.

> By not adhering to GHCH policy no. 9.2-1b and not allowing PLAINTIFF an opportunity to decide whether or not he wished to continue a relationship with GHCH, Defendants have violated 42 U.S.C. § 1981.

Dkt. 1 at 11.

As to Dr. Troeh, it appears that Dr. Johnson seeks to create a prima facie case with direct evidence of discriminatory intent. In this regard, Dr. Johnson offers the facts surrounding Dr. Troeh's conversation with Ms. Muse.

The *McDonnell-Douglas* burden-shifting analysis has three parts. First, the plaintiff must present a prima facie case. To make out a prima facie case of racial discrimination on the basis of disparate treatment, Dr. Johnson must show that (1) he belonged to a protected class; (2) he was performing his job in a satisfactory manner; (3) he was subjected to an adverse employment action; and (4) similarly situated employees not in his protected class received more favorable treatment. *Kang v. U. Lim America, Inc.*, 296 F.3d 810, 818 (9th Cir. 2002); *Cornwell*, 439 F.3d at 1028. If Dr. Johnson succeeds in presenting a prima facie case, there is a rebuttable presumption of discrimination. *Cornwell*, 439 F.3d at 1028.

At the second step of the analysis, the burden shifts to Defendants to articulate legitimate, non-discriminatory reasons for the adverse employment action. *Manatt v. Bank of America, NA*, 339 F.3d 792, 800 (9th Cir. 2003). If Defendants successfully carry

1  this burden of production, Dr. Johnson bears the ultimate burden of persuading the trier of

2  fact that the reason was merely a pretext for a discriminatory motive at the third step of

3  the analysis. *Id.* Even though plaintiffs must prove each element of the *McDonnell*

4  *Douglas* test, the requisite degree of proof to withstand summary judgment is "minimal

5  and does not even need to rise to the level of a preponderance of evidence." *Villiarimo v.*

6  *Aloha Island Air, Inc.,* 281 F.3d 1054, 1062 (9th Cir. 2002).

7      For purposes of summary judgment, the parties apparently do not dispute whether

8  Dr. Johnson was a member of a protected class. The parties' primary dispute is whether

9  Dr. Johnson's performance was satisfactory, whether similarly situated doctors outside of

10  Dr. Johnson's protected class received more favorable treatment, and whether

11  Defendants' proffered explanations are pretextual. To analyze Dr. Johnson's claim of

12  racial discrimination, the Court will focus on each of the alleged adverse "employment"

13  actions. While the parties dispute whether Dr. Johnson has established the existence of a

14  contractual relationship for purposes of 42 U.S.C. § 1981, the Court concludes that even

15  if such a contractual relationship existed, Dr. Johnson has failed to create a genuine issue

16  of material fact as to this claim. The Court will address each of the alleged adverse

17  actions in turn.

18      **1.     2001 Application for Privileges**

19      First, Dr. Johnson contends that his initial application for privileges was

20  incomplete and that he was therefore never truly granted admitting privileges. Dkt. 233 at

21  2. In support of this contention, Dr. Johnson offers a document titled "Grays Harbor

22  Community Hospital Privilege Form." Two versions of this form have been filed with the

23  Court. As explained more thoroughly below, the Court concludes that the varying

24  versions of this form do not create a genuine issue of material fact as to whether Dr.

25  Johnson was properly granted admitting privileges in the first instance or as to whether

26  Dr. Johnson suffered any damages as a result of irregularities pertaining to his initial

27  application for privileges.

28

ORDER - 17

In support of his opposition to the Doctor Defendants' motion for summary judgment, Dr. Johnson cites a version of the form that includes check marks indicating the specific privileges Dr. Johnson sought. *See* Dkt. 71, Exh. E at 31. There are three columns containing no check marks: Approved, Conditions, and Denied. *See id.* The form also includes blanks for the effective dates, and no dates are written. *See id.*

The version of the form that Dr. Johnson included with his complaint is different in two respects. First, the form indicates whether Dr. Johnson was granted each of the privileges he sought, as indicated by check marks in the approved, conditions, and denied columns. For example, Dr. Johnson indicated by check mark that he was seeking Neonatal Level 2 privileges. *See* Dkt. 1-2, Exh. G at 16. As to this request, there is a check mark in the "conditions" column and a handwritten notation indicating the condition. *See id.* Second, the form's effective date section is completed and indicates that Dr. Johnson's privileges are effective from November 28, 2001, to November 30, 2003. *See id.* Dr. Johnson believes that the second date was originally written as November 30, 2002, but was altered. Dkt. 233 at 2.

Dr. Johnson's allegation regarding the alteration of the date written on his application is mere speculation. Taking Dr. Johnson's allegations regarding his initial application as true, Dr. Johnson fails to demonstrate that he suffered any harm as a result of Grays Harbor's acceptance and granting of his application. There is no dispute that Dr. Johnson began to admit patients at Grays Harbor as if his application had been granted, and Dr. Johnson alleges no damages or injuries stemming from any abnormality in the acceptance and granting of his application.

## 2.    Change in Status from Provisional to Active

Second, in November of 2002, Dr. Johnson's privileging status was changed from "provisional" to "active." Dkt. 1 at 5. Dr. Johnson contends that he was not offered, and did not complete, an application packet for active staff privileges in late 2002 and therefore should not have been afforded active staff privileges. Dkt. 233 at 3. The parties

1   dispute whether advancement of provisional staff members to active status typically

2   required an application and whether Dr. Johnson in fact completed such an application.

3   *See* Dkt. 1-2, Exh. C at 6 (Section 9.2-1(b) of the Bylaws provides that clinical privileges

4   and medical staff membership automatically terminate upon expiration of the provisional

5   period.); Dkt. 225-4, Exh. 21 at 6 (Section 3.2-1(a) of the Bylaws provides that

6   provisional staff members are advanced to active status in the ordinary course of events

7   after serving on the provisional staff for twelve months unless they request otherwise.).

8   Taking Dr. Johnson's allegations as true, there is no issue of material fact to withstand

9   summary judgment because Dr. Johnson does not allege any *adversity* regarding his

10  advancement to active status. Again, there is no dispute that Dr. Johnson continued to

11  admit patients after November 2002 as if he were properly credentialed, and Dr. Johnson

12  alleges no damages or injuries stemming from any abnormality in his advancement to

13  active status. Similarly, while the parties dispute whether Dr. Johnson's initial term on

14  active status should have been for one year instead of two years, Dr. Johnson admitted

15  patients as if his term was for two years and alleges no injuries stemming from the longer

16  term.

### 3.  2003 Temporary Suspension

17

18      Third, on November 26, 2003, Dr. Johnson's privileges were temporarily

19  suspended for failure to complete delinquent patient charts. Dkt. 225-3, Exh. 11 at 4.

20  There is no dispute that Dr. Johnson was permitted to continue admitting patients, and Dr.

21  Johnson has failed to create a genuine issue of material fact as to whether he suffered any

22  damages as a result of this temporary suspension.

### 4.  2004 Credentialing Error

23

24      Fourth, in June of 2004, Dr. Shin informed Plaintiff that he had a "credentialing

25  error" in his file. Dkt. 1 at 5. Dr. Johnson's reappointment was ultimately confirmed

26  through a review of minutes from 2002 Board of Directors meetings. Dkt. 113 at 3. As a

27  result, Dr. Johnson was permitted to continue admitting patients to Grays Harbor. Dkt.

28

113 at 3. Dr. Johnson contends that discovery of the credentialing error "created doubt and caused [him] to suffer anxiety and distress." Dkt. 233 at 6. This conclusory allegation is insufficient to create a genuine issue of material fact as to whether Dr. Johnson suffered any damages as a result of the credentialing error, which was resolved within a period of weeks and after which Dr. Johnson continued to admit patients.

### 5.    2004 Suspension

Fifth, on September 3, 2004, Dr. Johnson was temporarily suspended for failing to complete a history and physical or sufficient progress notes for a detox patient admitted on August 24, 2004. Dkt. 113 at 4. Dr. Johnson contends that he was performing satisfactorily because, like other physicians, he verbally transferred care of this patient to another doctor, Dr. Canfield. Though Dr. Johnson does not differentiate among Defendants, this allegation implicates Dr. Shin and Dr. Canfield. *See* Dkt. 113 at 4 (Dr. Shin summarily suspended Dr. Johnson pending formal investigation by the Credentials Committee); *Id.* at 2 (From January 1, 2004, to December 31, 2004, Dr. Shin served as the Grays Harbor medical staff's Chief of Staff.). Dr. Johnson's transfer of care to Dr. Canfield relates to the patient who expired in 2003 and is not relevant to his 2004 summary suspension. Dkt. 225-2, Exh. 9 at 26.

While Dr. Johnson contends that physicians outside of his protected class similarly failed to monitor their patients but were not summarily suspended, Dr. Johnson fails to support this contention with facts. Dr. Johnson compares his performance to that of physicians who had delinquent charts, but offers no comparison of patient care and safety issues. *See* Dkt. 244.

As the Court has recognized, Dr. Johnson may only impose individual liability on Dr. Shin for decisions made outside of Dr. Shin's official capacity as Chief of Staff or for decisions that amount to gross negligence. Dr. Shin contends that he summarily suspended Dr. Johnson because he was concerned that Dr. Johnson was not making daily rounds with respect to a hospitalized patient suffering from alcohol withdrawal. Dkt. 113

at 4. As Chief of Staff, Dr. Shin conferred with Chief Executive Officer Thomas
Hightower and chair of the board Dr. Ralph Morris. *Id.* at 4. Dr. Shin telephoned Dr.
Johnson to determine why Dr. Johnson was not making daily rounds, and Dr. Johnson
said that he did not realize that daily rounds were required by medical staff rules and
regulations and that he was going through a difficult divorce at the time. *Id.* Dr. Shin
responded that Dr. Johnson's justifications were inadequate and summarily suspended Dr.
Johnson. *Id.* Dr. Shin contends that there were no other reports of this type of patient
safety incident while Dr. Shin was serving as Chief of Staff and that other physicians also
would have received a summary suspension for such conduct. *Id.* Dr. Johnson fails to
create a genuine issue of material fact as to whether Dr. Shin was grossly negligent.

Moreover, Dr. Johnson fails to create a prima facie case because he does not
dispute whether treatment of the detox patient was satisfactory. Dr. Johnson admits that
Dr. Shin told him that he was being suspended for failure to conduct rounds on his
patients, and the letter informing Dr. Johnson of his suspension indicates "substantial
concerns" regarding one of Dr. Johnson's patients. Dkt. 208, Exh. A at 10; Dkt. 1-2, Exh.
D at 8. Ms. Wright's indication to Molina that Dr. Johnson's privileges were suspended
on September 3, 2004, for "failure to complete delinquent patient charts in a timely
manner" does not conflict with the proffered reason for the suspension. *See* Dkt. 1-2, Exh.
E at 11. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cr. 1996)
(upholding summary judgment where allegedly "shifting" explanations were compatible).
As to Dr. Shin, summary judgment on Plaintiff's 42 U.S.C. § 1981 claim is therefore
granted.

### 6.    2004 Expiration of Privileges

Sixth, on November 29, 2004, Dr. Johnson's privileges expired because he did not
reapply. Dkt. 1-3, Exh. J at 8. Dr. Johnson has not created a genuine issue of material fact
as to whether this expiration of his privileges violates 42 U.S.C. § 1981.

1

### 7.    2006 Denial of Application

2      Seventh, on March 26, 2006, Dr. Johnson was not granted hospital privileges

3  because he had an unfavorable recommendation from the Primary Care Department

4  Chairperson and because there was an outstanding claim against his medical license. Dkt.

5  225-5, Exh. 34 at 31. Because Dr. Johnson does not dispute whether he had admitting

6  privileges during this time, there is no contractual relationship for purposes of  42 U.S.C.

7  § 1981, and summary judgment is proper.

8      ### 8.    Conclusion

9      Dr. Johnson advances several factual theories in support of his Section 1981 claim,

10  many of which involve apparent administrative irregularities for which Dr. Johnson does

11  not create a genuine issue of material fact as to any injury or damage. The Court

12  concludes that summary judgment on Plaintiff's Section 1981 claim is proper as to all

13  Defendants.

14  ## F.    NEGLIGENCE

15      Dr. Johnson's ninth cause of action is negligence. To support a claim for

16  negligence, a party must prove (1) the existence of a duty owed to the injured party; (2) a

17  breach of that duty; (3) a resulting injury; and (4) that the claimed breach is the proximate

18  cause of the injury. *Hansen v. Friend*, 118 Wn.2d 476, 485 (1992). Whether there is a

19  duty owed to the injured party is a question of law. *Patrick v. Sferra*, 70 Wn. App. 676,

20  683 (1993). Dr. Johnson fails to establish that physicians owe one another a duty with

21  respect to privileges. *But see Pedroza v. Bryant*, 101 Wn.2d 226 (1984) (hospitals owe a

22  duty to exercise reasonable care in granting and renewing staff privileges); *Ritter v. Board*

23  *of Com'rs of Adams County Public Hospital Dist. No. 1*, 96 Wn.2d 503 (1981) (in suit

24  against hospital, summary suspension that contravened standards upon which physicians

25  were entitled to rely was improper). To the extent that Dr. Johnson's negligence claims

26  are premised upon such a duty, summary judgment is therefore proper.

27

28

1

### 1.    Dr. Shin

2

Dr. Johnson alleges several distinct acts of negligence by Dr. Shin. First, Dr.

3

Johnson contends that Dr. Shin failed to review the credentials of the medical staff every

4

six months pursuant to Article 6.3(b)(3) and Regulation S. Dkt. 134 at 5. Particularly with

5

respect to Dr. Shin, this allegation cannot sustain Dr. Johnson's negligence claim. In this

6

regard, the Court notes that Dr. Shin was not involved in the credentialing process in

7

2003. Also, Dr. Johnson fails to allege any damages that resulted from the allegedly

8

untimely discovery of the credentialing error. Dkt. 208, Exh. A at 8.

9

Second, Dr. Johnson alleges that Dr. Shin failed to follow procedures regarding

10

summary suspension because he did not report the suspension in writing to the Chief

11

Executive Officer of Grays Harbor. Dkt. 134 at 5-6; *see* Dkt. 134-3, Exh. 68 at 25; Dkt.

12

134-4, Exh. 68 at 24-25. Dr. Shin conferred with the Chief Executive Officer before

13

summarily suspending Dr. Johnson, and it was the Chief Executive Officer who

14

ultimately informed Dr. Johnson of his suspension. Dkt. 113 at 4; Dkt. 1-2, Exh. D at 8.

15

Dr. Johnson admits that Dr. Shin told him that he was being suspended for failure to

16

conduct rounds on his patients, and the letter informing Dr. Johnson of his suspension

17

indicates "substantial concerns" regarding one of Dr. Johnson's patients. Dkt. 208, Exh.

18

A at 10; Dkt. 1-2, Exh. D at 8. To the extent that Dr. Johnson has created a genuine issue

19

of material fact as to whether Dr. Shin followed the Bylaws with respect to the 2004

20

suspension, Dr. Johnson fails to create a genuine issue as to any damages he may have

21

suffered and fails to allege facts demonstrating that Dr. Shin's actions were grossly

22

negligent. Dr. Shin is therefore entitled to summary judgment as to the negligence claim.

23

### 2.    Dr. Troeh

24

Dr. Johnson contends that Dr. Troeh negligently reported false information to

25

Molina. Dkt. 233 at 23. If Dr. Johnson's contentions are true, Dr. Troeh falsely reported

26

to Molina that Dr. Johnson abandoned one of his patients and that the patient died as a

27

result. While the Court cannot rule as a matter of law that such communications were

28

ORDER - 23

made in good faith, Dr. Johnson offers only conclusory assertions to support his contention that Dr. Troeh's statements to Ms. Muse negatively affected his relationship with Molina. *But see* Dkt. 225-6, Exh. 35 at 1. Without more, the evidence before the Court fails to create a genuine issue of material fact as to whether Dr. Johnson suffered any injury or damage as a result of Dr. Troeh's statements. Summary judgment as to this aspect of Dr. Johnson's negligence claim is therefore granted.

### 3.   Dr. Franciscovich

Dr. Johnson contends that Dr. Franciscovich did not comply with the Bylaws by either accepting an incomplete initial application for privileges or approving a two-year provisional period. Dkt. 233 at 24. As the Court has recognized in the context of Dr. Johnson's 42 U.S.C. § 1981 claim, Dr. Johnson fails to create a genuine issue of material fact as to whether he incurred any damages with respect to these contentions. Summary judgment as to Dr. Johnson's negligence claim against Dr. Franciscovich is therefore proper.

### 4.   Dr. May, Dr. Canfield, and Dr. Dueber

Dr. Johnson fails to differentiate among these Defendants or to state a negligence claim with any particularity or specificity. Summary judgment on Dr. Johnson's negligence claim is therefore granted as to Dr. May, Dr. Canfield, and Dr. Dueber.

### 5.   Mr. Hightower

Dr. Johnson contends that Mr. Hightower failed to notify Dr. Johnson of his right to request a hearing in connection with his 2004 suspension and that such failure constitutes negligence. Dkt. 256 at 18. The Bylaws provide that the Chief Executive Officer must notify applicants and Medical Staff appointees of their right to a hearing if there has been a recommendation to decrease clinical privileges. Dkt. 134-4, Exh. P68 at 6-7. In the reply, the Hospital Defendants contend that Dr. Johnson "let his privileges lapse, thereby terminating any alleged right to a hearing." Dkt. 259 at 3.

Mr. Hightower informed Dr. Johnson of his suspension in September of 2004, before Dr. Johnson allowed his privileges to lapse in November of that year. *See* Dkt. 1-3, Exh. J at 8; Dkt. 1-2, Exh. D at 8. Therefore, the Court cannot conclude that Dr. Johnson did not have a right to a hearing at the time of his summary suspension.

Mr. Hightower's letter did not specify Dr. Johnson's right to a hearing but did make mention of that right. Mr. Hightower's letter recommends that Dr. Johnson "refer to Article 11, 'Hearing and Appeal Procedures,' in the Medical Staff Bylaws" but does not state that Dr. Johnson "had a right to request a hearing on the proposed action within thirty (30) days" or include "a summary of [his] rights in such hearing." *See* Dkt. 1-2, Exh. D at 8; Dkt. 134-4, Exh. P68 at 6. Mr. Hightower's reference to Dr. Johnson's hearing right does not rise to the level of specificity provided in the Bylaws. Nevertheless, the Court concludes that Dr. Johnson fails to create a genuine issue of material fact as to whether Mr. Hightower's failure to provide the requisite level of specificity is grossly negligent in order to overcome Mr. Hightower's statutory immunity as Chief Executive Officer of Grays Harbor at the time the letter was written. Mr. Hightower is therefore entitled to summary judgment on Dr. Johnson's negligence claim.

### 6.    Dr. Rowe

Dr. Johnson's allegations regarding Dr. Rowe are purely factual, and it is unclear which claims Dr. Johnson asserts against Dr. Rowe. *See* Dkt. 256 at 18. It is not the responsibility of the Court to cull through Dr. Johnson's lengthy factual allegations and determine which facts support which causes of action, if any. Dr. Johnson's conclusory assertions regarding Dr. Rowe do not satisfy Dr. Johnson's burden in opposing summary judgment.

### 7.    Grays Harbor

To the extent that Dr. Johnson alleges that Grays Harbor is vicariously liable for the actions of Defendants entitled to summary judgment, summary judgment as to Grays Harbor is proper.

ORDER - 25

**G.    42 U.S.C. § 1983**

Section 1983 is a procedural device for enforcing constitutional provisions and
federal statutes; the section does not create or afford substantive rights. *Crumpton v.
Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). In order to state a claim under 42 U.S.C. §
1983, plaintiffs must demonstrate that (l) the conduct complained of was committed by a
person acting under color of state law and that (2) the conduct deprived a person of a
right, privilege, or immunity secured by the Constitution or by the laws of the United
States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by
Daniels v. Williams,* 474 U.S. 327 (1986). Section 1983 is the appropriate remedy only if
both elements are satisfied. *Haygood v. Younger,* 769 F.2d 1350, 1354 (9th Cir. 1985). In
addition, plaintiffs must allege facts demonstrating that individual defendants caused, or
personally participated in causing, the alleged harm. *Arnold v. IBM*, 637 F.2d 1350, 1355
(9th Cir. 1981). A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the
basis of supervisory responsibility or position. *Monell v. New York City Dept. of Social
Services*, 436 U.S. 658, 694 n. 58 (1978).

In limited circumstances, a person can be subject to liability under Section 1983
for the acts of others. *Hydrick v. Hunter*, 500 F.3d 978, 988 (9th Cir. 2007). Supervisors
can be held liable for their own action or inaction in the training, supervision, or control
of subordinates, acquiescence in subordinates' unconstitutional conduct, or for conduct
displaying "reckless or callous indifference to the rights of others." *Cunningham v. Gates*,
229 F.3d 1271, 1292 (9th Cir. 2000). While there is no respondeat superior liability under
Section 1983, a supervisor may be held responsible for the constitutional violations of
subordinates if the supervisor (1) participated in, (2) directed, or (3) knew of the
violations and failed to prevent the unconstitutional conduct. *Id.*; *Taylor v. List*, 880 F.2d
1040, 1045 (9th Cir. 1989); *see also Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)
("A person 'subjects' another to the deprivation of a constitutional right, within the
meaning of section 1983, if he does an affirmative act, participates in another's

affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation."). The supervisor's actions must be the proximate cause of the constitutional rights violation. *Redman v. County of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991).

The Doctor Defendants seek summary judgment on Dr. Johnson's Section 1983 claim because Grays Harbor Community Hospital is not a state actor for purposes of Section 1983, because Dr. Johnson alleges personal participation only by Dr. Troeh, and because Dr. Johnson's claim against Dr. Troeh does not arise to a constitutional violation. Dkt. 224 at 21.

A private party acts under color of law when the constitutional deprivation results from a governmental policy, and the party charged with the deprivation may fairly be characterized as a governmental actor. *Sutton v. Providence St. Joseph Medical Center*, 192 F.3d 826, 835 (9th Cir. 1999). A private party's conduct constitutes governmental action only in "rare" circumstances. *Id.* Courts consider the following factors or tests to identify whether there is "something more" justifying liability under Section 1983: "(1) public function, (2) joint action, (3) governmental compulsion or coercion, and (4) governmental nexus." *Id.* at 835-36.

In this case, Dr. Johnson does not contend or demonstrate that Defendants acted pursuant to a governmental policy and that Defendants may fairly be characterized as government actors. *See* Dkt. 256. Instead, Dr. Johnson contends that Grays Harbor is "a quasi-public hospital subject to the same responsibilities as a public hospital." Dkt. 256 at 4. Dr. Johnson appears to equate Grays Harbor's nonprofit status with being "public" or "quasi-public" but offers no authority for imposing liability under Section 1983 where the only evidence of "something more" is nonprofit status. Defendants offer evidence that Grays Harbor is a privately owned nonprofit corporation. Dkt. 248-4, Exh. C at 2; Dkt. 261 at 2. Plaintiff fails to refute that evidence and therefore fails to create a genuine issue

1   of material facts as to whether the alleged constitutional deprivations were under color of

2   law. Summary judgment on Plaintiff's Section 1983 claim is therefore proper.

3   **H.    VIOLATION OF CRIMINAL STATUTES AND BLACKLISTING**

4       Dr. Johnson claims that Defendants committed fraud, forgery, and defamation in

5   violation of certain criminal statutes. *See* Dkt. 1 at 11 ("By defaming PLAINTIFF,

6   Defendants have violated . . . RCW 9.58.010"), 12 ("Fraud and Forgery pursuant to RCW

7   9A.60.020 and RCW 9A.60.010."). As the Court has previously noted with respect to Dr.

8   Shin, Dr. Johnson cites no authority for asserting a private, civil cause of action under

9   these statutes. Summary judgment on Dr. Johnson's statutory claims for fraud, forgery,

10  and defamation is therefore proper. *See* Dkt. 146 at 14.

11      Similarly, Dr. Johnson contends that Defendants tortiously interfered with present

12  and prospective employment relationships in violation of RCW 49.44.010, which makes

13  blacklisting a criminal offense. As is true of the criminal code provisions above, Dr.

14  Johnson fails to establish that RCW 49.44.010 offers a civil remedy. Summary judgment

15  is therefore granted as to Plaintiff's blacklisting claim.

16  **I.    DEFAMATION**

17      In his fourth cause of action, Dr. Johnson contends that he was defamed in

18  violation of 42 U.S.C. § 1983, RCW 9.58.010, and RCW 49.44.010. To the extent that

19  Dr. Johnson's defamation claim is based upon state statutes, summary judgment is proper.

20  It is unclear from Dr. Johnson's complaint whether he seeks to assert a common law

21  claim for defamation. The Court assumes that Dr. Johnson does assert a common law

22  defamation claim.

23      To survive summary judgment, Dr. Johnson must create a genuine issue of

24  material fact as to each of the following elements: (1) falsity of the communication; (2)

25  lack of privilege; (3) fault; and (4) damages. *Mohr v. Grant*, 153 Wn.2d 812, 822 (2005).

26  The falsity prong is satisfied with evidence that a statement is provably false or leaves a

27  false impression. *Id.* at 825.

28

Dr. Johnson's defamation allegations involve only Sue Vance, Catherine Wright Tim Troeh, and "Doe 1." *See* Dkt. 1 at 5, 7, 8-9; Dkt. 233 at 15 ("[I]t cost [Plaintiff] more than $30,000 to overcome Def Troeh's slander."). In opposing summary judgment, Dr. Johnson adds additional allegations regarding Patti Grah. Dkt. 233 at 26. Summary judgment on Dr. Johnson's defamation claim is therefore proper as to Dr. May, Dr. Canfield, Dr. Dueber, Dr. Franciscovich, Dr. Rowe, and Mr. Hightower.

### 1.    Dr. Troeh's Statements

As explained in more detail below, the Court concludes that Dr. Troeh's statements fall within the common interest qualified privilege, with the exception of Dr. Troeh's statement regarding the death of Dr. Johnson's patient, and that even if such privilege did not apply, Dr. Johnson fails to create a genuine issue of material fact as to whether the remaining statements are false or create a false impression. The Court concludes that summary judgment is proper as to Dr. Johnson's defamation claim against Dr. Troeh because Dr. Johnson fails to create a genuine issue of fact as to whether Dr. Troeh's false statement caused Dr. Johnson damage or injury.

### a.    Qualified Privilege

Dr. Troeh contends that his statements to Ms. Muse of Molina are entitled to a qualified privilege because they furthered a common interest between Grays Harbor Community Hospital and Molina. Dkt. 224 at 23. *See Pate v. Tyee Motor Inn, Inc.*, 77 Wn.2d 819, 820-21 (1970) ("A privileged communication involves the occasion where an otherwise slanderous statement is shared with a third person who has a common interest in the subject and is reasonably entitled to know the information."). Whether a qualified privilege applies is a matter of law for courts to determine. *Moe v. Wise*, 97 Wn. App. 950, 957 (1999). Most situations in which the common interest privilege applies involve persons from the same organization or enterprise. *Id.* at 958-59. The speaker and the third party need not be allies; rather, the speaker and the third party must both have an interest in the subject matter of the defamatory statement. *Id.* at 959.

1       A qualified privilege by definition is not absolute. Whether the speaker has abused

2   a qualified privilege such that the privilege is lost is ordinarily a question of fact for the

3   jury unless the facts support only one reasonable conclusion. *Id.* at 962. Defamation

4   plaintiffs can demonstrate that a qualified privilege has been abused in one of five ways:

5   (1) the speaker knew the statement to be false or acted in reckless disregard as to its

6   falsity, (2) the speaker did not make the statement for the purpose of protecting the

7   common interest, (3) the speaker knowingly published the matter to a person who is not

8   covered by the privilege, or (4) the speaker did not reasonably believe the subject matter

9   was necessary to serve the common interest, or (5) the speaker published both privileged

10  and unprivileged statements. *Id.* at 963. Evidence of abuse of the privilege must be clear

11  and convincing. *Id.*

12      If a defamation defendant demonstrates that the statement falls within a qualified

13  privilege, the burden shifts to the plaintiff to show abuse of the privilege. *Alpine*

14  *Industries Computers, Inc. v. Cowles Pub. Co.*, 114 Wn. App. 371, 382 (2002).

15      Dr. Troeh has successfully demonstrated that, with one exception, his statements

16  fall within the common interest qualified privilege. Dr. Troeh's statements concern Dr.

17  Johnson's admitting status at Grays Harbor Community Hospital. Both Molina and Grays

18  Harbor shared an interest in this subject matter. Dr. Johnson's response does not address

19  the common interest qualified privilege and therefore does not satisfy Dr. Johnson's

20  burden to provide clear and convincing evidence that Dr. Troeh abused the qualified

21  privilege.

22      With respect to Dr. Troeh's statement that Dr. Johnson abandoned one of his

23  patients and that the patient died as a result, Dr. Johnson has successfully created a

24  genuine issue of material fact as to each element of the prima facie case and as to whether

25  Dr. Troeh abused the qualified privilege because he knew the statement to be false at the

26  time the statement was made. *See* Dkt. 225-3, Exh. 16 at 18 (documentation noting that

27  Dr. Troeh saw the detox patient's chart). Similarly, Dr. Johnson has raised a genuine issue

28

ORDER - 30

of material fact as to whether this statement was made in good faith and entitled to statutory immunity or immunity under the Bylaws.

### b.    Falsity

Even if the common interest qualified privilege did not apply to Dr. Troeh's remaining statements to Molina, Dr. Johnson fails to create a genuine issue of material fact as to whether many of Dr. Troeh's statements were false.

The falsity prong is satisfied with evidence that a statement is provably false or leaves a false impression. *Mohr*, 153 Wn.2d at 825. In a defamation by omission case, defamation plaintiffs must show that the statement left a false impression that would be contradicted by the inclusion of omitted facts. *Id.* at 827. Evidence that favorable facts or facts that should or could have been included is insufficient to demonstrate falsity. *Id.*

First, Dr. Johnson contends that Dr. Troeh's statement regarding Dr. Johnson's prescribing of narcotics is false. Dr. Troeh reportedly told Ms. Muse that "Dr. Johnson prescribes an excessive amount of narcotics." Dr. Johnson contends that this statement is defamatory because "there is no such thing as 'prescribing an excessive amount of narcotics.'" Dkt. 233 at 16. The word "excessive" connotes an opinion that is not provably false.

Second, Dr. Johnson alleges that statements regarding his patients consistently having overdose issues create a false impression: "They consistently have his patients in the Emergency Room with overdose issues. Some of these patients are currently taking three or four different narcotics." Dkt. 233 at 16. While Dr. Johnson does not contend that these statements are false, he contends that they omit material facts. *Id.* at 17 ("[P]erhaps they were taking medicine that had been prescribed by other physicians. Perhaps they were taking medications that had not been prescribed by any physician."). These suppositions are not "facts" that would contradict the impression created by Dr. Troeh's statements.

Third, Dr. Johnson offers Mr. Troeh's statement that "Dr. Johnson is a smart guy but does not have good habits." Dkt. 233 at 18. Whether Dr. Johnson is "smart" and whether his habits are "good" are statements of opinion that can neither be proved nor disproved.

Fourth, Dr. Johnson contends that the statement that "[Dr. Johnson] is the physician that drug seeking patients go to" is demonstrably false and implies that Plaintiff unlawfully prescribes opioid medications. Dkt. 233 at 19. Again, this statement is not provably false. Whether patients are "drug seekers" is a matter of medical opinion. The Court therefore concludes that Dr. Johnson fails to create a genuine issue of material fact as to whether Dr. Troeh's statements were false, with the exception of Dr. Troeh's statement to Molina regarding the death of Dr. Johnson's patient.

### c.   Damages

Dr. Johnson contends that Dr. Troeh's statements to Ms. Muse damaged the relationship between Dr. Johnson and Molina. *See* Dkt. 233 at 15 ("[I]t cost [Plaintiff] more than $30,000 to overcome Def Troeh's slander."). Dr. Johnson does not clarify the nature of his relationship with Molina and the impact that Dr. Troeh's statements had on that relationship. The copy of the arbitration award as to Dr. Johnson and Molina similarly does not disclose such a causal connection. Dr. Johnson cannot withstand summary judgment merely through assertions and contentions regarding damages he believes are related to Dr. Troeh's statements. Summary judgment as to Dr. Johnson's defamation claim against Dr. Troeh is therefore proper.

### 2.   Patti Grah's Memorandum For Record

Dr. Johnson's allegations regarding a Memorandum for Record authored by Patti Grah are unclear. *See* Dkt. 233 at 26. The facts regarding defamation by Ms. Grah, in the light most favorable to Plaintiff, are as follows: Carole Halsan, on behalf of Willapa Harbor Hospital, wrote to Joni Brodie regarding documentation provided by Dr. Johnson. *See* Dkt. 234, Exh. P130 at 74. Ms. Halsan expressed confusion over a document dated

July 13, 2005, that appeared to be incomplete, to bear the Grays Harbor medical staff letterhead in a different location, and to contain incorrect dates. *See id.*; Dkt. 1-2, Exh. E at 11. Dr. Johnson does not contend or demonstrate that the memorandum signed by Ms. Grah is false. Dr. Johnson therefore fails to create a genuine issue of material fact as to whether Ms. Grah's actions were defamatory.

### 3.    Conclusion

Dr. Johnson disputes several statements apparently made by Dr. Troeh to Ms. Muse. To the extent that the statements constitute opinions, they cannot support a claim for defamation. To the extent that Dr. Johnson contends that Dr. Troeh's statements were misleading, Dr. Johnson fails to point to facts that would have cured or prevented any false impression created by Dr. Troeh's statements. While Dr. Johnson has successfully created a genuine issue of material fact as to whether Dr. Troeh's statement about Dr. Johnson's patient dying was defamatory and as to whether Dr. Troeh abused the qualified privilege because he knew the statement to be false, Dr. Johnson fails to offer facts attributing the statement to any damages. The Court therefore concludes that summary judgment on Plaintiff's defamation claim is proper as to all Defendants.

## J.    IMPAIRMENT OF CONTRACT

Dr. Johnson contends that Defendants impaired the obligation of contract in violation of Article 1, Section 10 of the United States Constitution and Article 1, Section 23 of the Washington State Constitution. Dkt. 1 at 12. As the Court has previously indicated with respect to Dr. Shin, Dr. Johnson fails to cite any state legislative action that allegedly impaired the obligation of contract. *See Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wn. App. 1, 6 (1989) (Because "only a Legislature can 'pass' a 'law' impairing contractual obligations[,] . . . only state legislation implicates the contract clause."); *see also Tidal Oil Co. v. Flanagan*, 263 U.S. 444, 451 (1924) ("It has been settled by a long line of decisions, that the provision of section 10, article 1, of the federal Constitution, protecting the obligation of contracts against state action, is directed only against

impairment by legislation and not by judgments of courts."). Summary judgment as to Dr. Johnson's fifth cause of action is therefore proper as to the remaining Defendants.

## K.   TORTIOUS INTERFERENCE WITH PRESENT AND PROSPECTIVE EMPLOYMENT RELATIONSHIPS

Dr. Johnson alleges that Defendants tortiously interfered with present and prospective employment relationships in violation of 42 U.S.C. §§ 1991, 1983, the Fourteenth Amendment to the United States Constitution, and RCW 49.44.010. Dkt. 1 at 12.

A claim of tortious interference with a contractual relationship or business expectancy has five elements:

(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

*Pacific Northwest Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 351 (2006).

Dr. Johnson's tortious interference claim is apparently brought only against Dr. Troeh[3] for statements Dr. Troeh made to Molina: "Although Plf's provider agreement with Molina was initially terminated, it cost him more than $30,000 to overcome Def Troeh's slander and have his provider agreement reinstated. Even then, Def. Troeh's actions had poisoned the contractual relationship that Plf enjoyed with Molina to the extent that it could not survive." Dkt. 233 at 15. As the Court has noted with respect to the defamation claim, Dr. Johnson cannot withstand summary judgment merely through assertions and contentions regarding damages caused by Dr. Troeh's statements. These contentions are insufficient to withstand summary judgment on Dr. Johnson's tortious

---

[3] Dr. Johnson also appears to contend that his summary suspension constituted intentional interference with his contractual relationship with Molina: "Molina Healthcare failed to renew his provider contract because Defs wrongfully upheld Plf's wrongful summary suspension." Dkt. 233 at 8. The Court having concluded that Dr. Johnson fails to create a genuine issue of material fact as to whether the suspension violates 42 U.S.C. § 1981, the Court concludes that there is no genuine issue of material fact as to whether Dr. Johnson's summary suspension supports a tortious interference claim.

interference claim against Dr. Troeh, and summary judgment is therefore granted on this claim.

**L.     BREACH OF CONTRACT**

Dr. Johnson's complaint does not include a claim for breach of contract, and the Court therefore does not reach the parties' arguments regarding any such claim.

**M.     OTHER DEFENDANTS**

In their answer, Defendants Grays Harbor, Dr. Rowe, and Mr. Hightower deny that the Grays Harbor Community Hospital Medical Staff and the Grays Harbor Community Hospital Governing Board are legal entities or are proper parties to this case. Dkt. 12 at 3. As noted by Dr. Johnson, these parties are not subject to the pending motions. Dkt. 256 at 17 n.2. Dr. Johnson is therefore ordered to show cause, if any he may have, why the Court should not dismiss all claims against  the Grays Harbor Community Hospital Medical Staff and the Grays Harbor Community Hospital Governing Board with prejudice.

## IV. ORDER

Therefore, it is hereby

**ORDERED** that Defendant Shin's Second Motion for Summary Judgment (Dkt. 207) is **GRANTED**, Defendants Timothy Troeh, MD; Gregory May, MD; Daniel Canfield, DO; Shelly J. Dueber, MD; and Robin Franciscovich, MD's Motion for Summary Judgment (Dkt. 224) is **GRANTED**, and Defendants Grays Harbor Community Hospital, Brent Rowe, MD, and Thomas Hightower's Motion for Summary Judgment (Dkt. 248) is **GRANTED**.

It is further **ORDERED** that on or before April 18, 2008, Plaintiff shall show cause, if any he may have, why his claims against the Grays Harbor Community Hospital Medical Staff and the Grays Harbor Community Hospital Governing Board should not be dismissed with prejudice. Defendants may respond to Plaintiff's showing on or before

1   April 28, 2008, Plaintiff may reply on or before May 1, 2008, and this matter is noted for

2   consideration on May 2, 2008.

3       DATED this 25th day of March, 2008.

4

5

6

7       BENJAMIN H. SETTLE
        United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER - 36